Jeffrey CAGAN and Cagan Realty, Inc., Receiver, Plaintiff,

v.

INTERVEST MIDWEST REAL ESTATE CORPORATION, f/k/a Inland Real Estate Corporation, Defendant.

No. 90 C 4941.

United States District Court, N.D. Illinois, E.D.

Aug. 7, 1991.

Lawrence W. Schad, Steven B. Diamond, Mary E. Phillips, Beeler, Schad & Diamond, P.C., David A. Genelly, Fishman & Merrick, P.C., Chicago, Ill., for plaintiff.

Howard M. Richard, Sheldon T. Zenner, James E. Hanlon, Jr., Katten Muchin & Zavis, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

 Jeffrey Cagan and Cagan Realty, Inc. (collectively "Cagan," treated as a singular noun) sues Intervest Midwest Real Estate Corporation ("Intervest") for Intervest's default on a $2,594,809 promissory note (the "Note") delivered to Briarbrook Joint Venture ("Venture") in consideration for the purchase of certain property.[1] Cagan now moves for judgment on the pleadings pursuant to Fed.R.Civ.P. ("Rule") 12(c).[2] For the reasons stated in this memorandum opinion and order, the motion is granted and judgment will be entered in Cagan's favor on August 30, 1991.

### Facts

In 1975 Kenneth Boula ("Boula") and Dean Gordon ("Gordon") acquired the 342-unit Briarbrook Village apartment complex located in Wheaton, Illinois (the "Property") on Venture's behalf. At the time of the purchase, legal title to the Property was held by LaSalle National Bank as trustee ("Trustee") of Land Trust No. 46363 dated July 13, 1973 (the "Land Trust"), subject to a first mortgage insured by the Department of Housing and Urban Development ("HUD") and a HUD Regulatory Agreement to which Trustee was a party. This was among the restrictions contained in the Regulatory Agreement (Amended Complaint ("Complaint") Ex. A[3] at 2):

> 6. Owner shall not without the prior written approval of the Secretary:
>
> (c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property....

HUD imposed similar restrictions in the Land Trust Agreement: No assignment of beneficial interest could be binding until lodged with Trustee, and no assignment could be accepted by Trustee until ten days after HUD had been notified and the new assignee had become a party to the Regulatory Agreement (Ex. B at 3).

As principal and general partner of Inland–Briarbrook Limited Partnership ("Inland–Briarbrook"), Intervest (which was known as Inland Real Estate Corporation until it changed its name on August 16, 1989[4]) entered into a contract for purchase of the Property from Venture on December 7, 1981[5] (the "Contract"). In the Contract all parties acknowledged the existence of the HUD financing and Regulatory Agree-

---

1. Although Intervest's Amended Answer ("Answer") ¶ 2 says that it lacks knowledge or information sufficient to form a belief on this score, an examination of the court file in *Gaskill v. Gordon,* 88 C 3404, 1988 WL 102077 (N.D.Ill.)— of which this Court may take judicial notice—confirms that Cagan (listing both names) was appointed as receiver by this Court's colleague, Honorable Ann Williams, to administer assets including the Note. Incidentally, this opinion's usage of "Cagan" as a singular noun is consistent with the usage in Judge Williams' order of appointment.

2. On a Rule 12(c) motion, this Court must accept as true all well-pleaded material allegations of the non-movant and draw all reasonable inferences from the pleadings in favor of the non-movant—in this case Intervest (*Gillman v. Burlington Northern Railroad,* 878 F.2d 1020, 1022 (7th Cir.1989)). All documents attached to the pleadings as exhibits are considered part of the pleadings for the purposes of this motion (Rule 10(c)). Judgment on the pleadings is appropriate when, based on the facts admitted, no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law (*National Fidelity Life Insurance Co. v. Karaganis,* 811 F.2d 357, 358 (7th Cir.1987)).

3. All further citations to exhibits to the Complaint will simply take the form "Ex.—."

4. To avoid even more confusion stemming from the large cast of characters, this opinion will consistently speak of "Intervest" even as to actions taken and documents signed in its former corporate name.

5. From the looks of this case, Cagan doubtless also views that fortieth anniversary of the attack on Pearl Harbor as "a date that will forever live in infamy."

ment, and Inland–Briarbrook agreed to acquire the Property subject to the HUD mortgage and Regulatory Agreement. After HUD approval was obtained, the sale closed on December 23, 1982. At closing Venture assigned the beneficial interest in the Land Trust to Inland–Briarbrook, and in late 1982 or early 1983 HUD approved that assignment.

In partial payment for the Property (and as the Contract had provided from the beginning), Intervest issued the Note dated December 15, 1982 in the amount of $2,594,809 and assumed the HUD first mortgage loan in the approximate amount of $4,884,839. One provision of the Note stated in relevant part (Ex. G at 4–5):

> This Note ... shall immediately become due and payable without notice or demand upon the occurrence with respect to the maker hereof of any of the following events: ...
>
> assignment of security or beneficial interest in land Trust No. 46363 at LaSalle National Bank and Trust Company of Chicago.

On March 14, 1988 Intervest refinanced the Property and, acting as general partner of Inland–Briarbrook, assigned the beneficial interest in the Land Trust to Briarbrook Village Limited Partnership ("Briarbrook Village"). That assignment was substantive in nature—not merely for collateral purposes.[6] Later that same day Intervest, this time acting as general partner of Briarbrook Village, granted a security interest and collateral assignment in the Land Trust to Heller Financial, Inc. Intervest also executed a Joinder by Holder of Power of Direction (Ex. I at 8):

> The undersigned, being the sole holder of the power of direction under the Trust, hereby joins in the foregoing Combined Security Agreement and Collateral Assignment of Beneficial Interest in Land Trust for the purposes of: (i) granting, transferring, setting over and assigning to Secured Party, all of his rights, title and interest in and to the power of direction under the Trust, and (ii) agreeing to be bound by all of the representations, warranties, covenants and agreements contained in the foregoing instrument.

On February 15, 1990 Intervest again refinanced the Property and, again acting as general partner of Briarbrook Village, granted a security interest and collateral assignment in the Land Trust to Confederation Life Insurance Company.

On July 14, 1988, pursuant to an Agreed Order in *Gaskill*, Cagan was appointed as federal receiver authorized to acquire most of the properties belonging to entities owned by Boula and Gordon (see the later opinion in *Gaskill*, 1988 WL 102077, 1988 U.S. Dist. LEXIS 10957, at 1) and came into ownership of the Note in that capacity. On August 31, 1989 Cagan signed a stipulation that Intervest had fulfilled its obligations with respect to the Property—but at that time Intervest had never informed Venture or Cagan that it had refinanced the Property before that stipulation. On August 17, 1990 Cagan asserted a default under the terms of the Note and demanded payment of all principal and interest.

### Jurisdiction

Intervest's Answer to the Complaint admits this Court's subject-matter jurisdiction (Answer ¶ 4). But because such jurisdiction cannot of course be conferred by consent of the parties, a few words should be said about its existence—something that

---

**6.** Intervest's Answer ¶ 27, though admitting the truth of the preceding two sentences in the text, goes on to say:

> Further answering, Intervest states that the assignment described reflected a cure of a previously attempted assignment to Briarbrook Village Limited Partnership from Inland–Briarbrook Partnership that inadvertently had been executed by Inland Real Estate Corporation in its individual capacity in connection with the original acquisition of the Property. The payee of the Note, Briarbrook

> Joint Venture, knew that the property was to be syndicated and that a separate entity was to be created for that purpose to which the property would be transferred either by Trustee's Deed or by assignment of the beneficial interest.

Under Rule 12(c) principles this Court must (and does) accept the truth of those factual assertions, which are also stated in the Answer as the basis for Intervest's Ninth Affirmative Defense (addressed later in this opinion).

this Court had confirmed at the outset of this lawsuit as part of its threshold obligation, as summarized succinctly in *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir. 1986):

> The first thing a federal judge should do when a complaint is filed is check to see that federal jurisdiction is properly alleged.

Complaint ¶ 2 first identifies Cagan as the federal receiver appointed in *Gaskill* and then goes on with a number of allegations about Boula and Gordon and about a massive Ponzi scheme that they had assertedly carried on through a series of limited real estate partnerships, including Venture. Because Intervest disclaims knowledge or information sufficient to form a belief as to the truth of those allegations (Answer ¶ 2), all of them are deemed denied under Rule 8(b)—so that this Court cannot take cognizance of them for purposes of Cagan's Rule 12(c) motion (see nn. 1 and 2).

■ But this Court's ability to take judicial notice of the court order in *Gaskill* appointing Cagan as receiver (see 5A Wright and Miller, *Federal Practice and Procedure: Civil 2d* § 1367, at 509 & n. 3 (2d ed. 1990)) solves that problem. That being so, Cagan's status as federally-appointed receiver is his jurisdictional ticket of entry to this District Court. As *Tcherepnin v. Franz*, 485 F.2d 1251, 1255–56 (7th Cir.1973) (footnotes and citations omitted) put it:

> The ancillary jurisdiction of federal courts over actions incident to a receivership established by a federal court has long been recognized. So long as an action commenced by a court appointed receiver seeks "to accomplish the ends sought and directed by the suit in which the appointment was made, such action or suit is regarded as ancillary so far as the jurisdiction of the ... court of the United States is concerned."

---

7. Intervest has interposed other affirmative defenses to the Complaint as well, but it acknowledges (at its Mem. 9) that only the four that are embraced in the listing that follows in the text are relevant to the current Rule 12(c) motion.

*Legal Positions of the Parties*

Cagan argues that judgment on the pleadings is appropriate because the several assignments made by Intervest (even one of which would have been enough for the purpose) triggered the acceleration clause in the Note, thus making the Note due immediately. Intervest admits that the assignments were made but contends that the Note never became due for several reasons that may be summarized in these terms: [7]

1. That acceleration clause in the Note is unenforceable as a restraint on alienation.

2. Ambiguities in the acceleration clause give rise to factual disputes.

3. There was a mutual mistake as to the form of the Note as it was signed and delivered, as compared with what was intended to be delivered.

4. Lack of consideration renders the acceleration clause unenforceable.

5. Cagan waived the right to make use of the terms of the acceleration clause.

This opinion will address each of those arguments in turn.

*Restraint on Alienation*

■ Restraints on alienation are not invalid per se under Illinois law.[8] *Gale v. York Center Community Cooperative, Inc.*, 21 Ill.2d 86, 92, 171 N.E.2d 30, 33 (1960) held that although as a general rule restraints on alienation are void:

> Such a restraint may be sustained, however, when it is reasonably designed to attain or encourage accepted social or economic ends.

More to the point here than that generalization, *Baker v. Loves Park Savings & Loan Association*, 61 Ill.2d 119, 125, 333 N.E.2d 1, 4 (1975) has expressly held that a due-on-sale clause in a mortgage is a rea-

---

8. There is no question that Illinois substantive law provides the rules of decision here—that is what the Note says, and both parties agree to that as well (perhaps their only area of agreement).

sonable restraint on alienation as a matter of law.

In *Baker* the mortgagor covenanted not to permit, without prior mortgagee consent, the "sale, assignment or transfer of any right, title or interest in and to said property or any portion thereof," and the note secured by the mortgage stated that its unpaid balance would become due and payable upon any default of the obligations in the mortgage (*id.* at 121, 333 N.E.2d at 2). In upholding the validity of that clause, *Baker, id.* at 125, 333 N.E.2d at 4 reasoned:

> The extension of credit by a lender to a debtor involves more than a mere reliance on the property mortgaged as security for the obligation. Involved in each transaction is also the appraisal of the personal integrity of the borrower. It seems to be completely justifiable for the protection of the security interest of the lender to prohibit the alienation, without the consent of the lender, of property which stands as security for the debt to a person whose personal and financial qualities are unknown to and were never considered by the lender in making the loan.

Indeed, *Baker* expressly rejected a case-by-case test of reasonableness because of the importance of stability of real estate titles. More recently, reaffirming *Baker* (as have a substantial number of other Illinois cases), *Abdul–Karim v. First Federal Savings & Loan Association of Champaign,* 101 Ill.2d 400, 405, 78 Ill.Dec. 369, 371, 462 N.E.2d 488, 490 (1984) has stated the principle succinctly:

> This court recognizes due-on-sale provisions as valid *per se.*

Intervest attempts to distinguish the acceleration clause in the Note from the due-on-sale clause in *Baker* in two respects. Neither has any merit.

First, Intervest argues that the *Baker* reasoning does not apply to the situation in this case—that there really was no restraint here because Intervest could have directed Trustee as titleholder to deed out, or to mortgage, the Property in any event. Were that so, though, Intervest would effectively gut its own argument: If there is in fact no restraint, then by definition the acceleration clause cannot be a restraint on alienation—and by further definition it cannot be an unreasonable (and hence invalid) restraint.

That contention by Intervest, however, reflects a total mischaracterization of the nature of the transfer of a beneficial interest in a land trust. *Wachta v. First Federal Savings & Loan Association of Waukegan,* 103 Ill.App.3d 174, 176–77, 58 Ill.Dec. 676, 679, 430 N.E.2d 708, 711 (2d Dist.1981) (citations omitted) explains what is known to every experienced Illinois real estate practitioner (and, in all likelihood, even to practitioners with a bare modicum of experience):

> An Illinois land trust is an arrangement under which, pursuant to statute, legal and equitable title to real property is held by a trustee and the interest of the beneficiary is personal property. The owner of the beneficial interest in a land trust is accorded four basic powers: (1) to possess, manage and physically control the real estate; (2) to receive all income generated by the property; (3) to direct the trustee in dealing with title to the real estate; and (4) to receive the proceeds of any sale of the property made pursuant to the power of direction. The owner of the beneficial interest also is empowered to transfer all or any number of the incidents of his beneficial ownership and may do so by a general assignment of the beneficial interest, excepting therefrom that which he seeks to retain.

Except for the convenient separating out of the bare title-holding functions, the owner of the beneficial interest holds all of the attributes of ownership of the real estate— so much so that in substantive terms the transfer of all the beneficial interest in a land trust is indistinguishable from a sale of the underlying property itself (*Oak Trust & Savings Bank v. Chicago Title & Trust Co.,* 129 Ill.App.3d 250, 252, 84 Ill. Dec. 537, 538, 472 N.E.2d 497, 498 (3d Dist.1984)). Hence a clause accelerating payment upon assignment of the beneficial

interest has all of the relevant characteristics of a due-on-sale clause, implicating the holding in *Baker* (see, e.g., *Oak Trust, id.*).

■ Second, Intervest argues that while the mortgage in *Baker* was secured by the property, here the Note is unsecured. It therefore urges that there is no lender's security that needs protection, depriving the *Baker* rationale of any relevance to this case. However, *Baker* stands for more than that in its holding that the restraint served a legitimate lender purpose. As *Baker* was characterized in *Damen Savings & Loan Association v. Heritage Standard Bank & Trust Co.*, 103 Ill. App.3d 301, 302, 59 Ill.Dec. 15, 16, 431 N.E.2d 34, 35 (2d Dist.1982) (emphasis added, citations to *Baker* omitted):

> The court held that the reasonableness of the restraint on alienation must be judged by the "underlying purpose of the restraint," and that the restraint was valid in the case before them as reasonably related to a legitimate lender's purpose, which included not only reliance on the property mortgaged as security for the obligation but also protection against transfer of the property to a person whose personal and financial qualities were unknown to and never considered by the lender in making the loan.

That second purpose holds equally true in this case, where Venture was aware of the identity and qualities of Inland–Briarbrook but had no knowledge of the later assignments of beneficial interest (and a fortiori had no knowledge of the identities of the assignees): Intervest admits it did not give actual notice to Venture of the assignments (Answer ¶ 37), and of course it cannot rely on constructive notice because such assignments do not affect legal title and are therefore not placed of record in the chain of title (see Kenoe, *Land Trusts* § 3.2, at 3–3 (1989)).

■ Moreover, commentators in this area of law have identified various other legitimate, practical and economic reasons for restricting the right to make later assignments (either outright or subordinate) of the beneficial interest, and some of those are equally applicable to unsecured transactions (Kenoe § 5.44, at 5–153):

> This practice [of subsequent and subordinate assignments] complicates the records of the trustee, imposes undue burdens on it in its effort to protect the secured party, complicates the exercise of the power of direction, makes procedures upon default more complex, and dilutes the ability of a borrower to repay the loan secured by the assignment of the beneficial interest. These practical considerations indicate that a lender should, whenever possible, restrict further borrowing on the security of the beneficial interest....

Indeed, the conventional wisdom is that although it may be unusual for a land trust to issue unsecured notes or obligations, it is entirely possible to do so—and again Kenoe notes (*id.* § 5.57, at 5–186):

> This type of land trust financing should inhibit further dealing with the property in trust or the beneficial interest.

In sum, this Court holds that the acceleration clause in the Note was a reasonable restraint on alienation. That result is compelled by the entire congeries of reasons already set out in this section.

### Ambiguity

■ Illinois case law uniformly teaches that whether a contract is ambiguous is itself a question of law (see, among the many cases so holding, *City of Clinton v. Moffitt*, 812 F.2d 341, 342 (7th Cir.1987), citing *Wilson v. Illinois Benedictine College*, 112 Ill.App.3d 932, 937, 68 Ill.Dec. 257, 263, 445 N.E.2d 901, 907 (2d Dist. 1983)). Although a contract may be viewed as ambiguous when its terms can reasonably be interpreted in more than one way, it is *not* ambiguous simply because the parties do not agree on the proper interpretation of its terms (*J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill.App.3d 744, 748, 141 Ill.Dec. 347, 349, 551 N.E.2d 340, 342 (1st Dist.1990)).

■ Intervest claims that the Note's acceleration clause is ambiguous in two respects. First, as to the phrase "upon the occurrence with respect to the maker here-

of of any of the following events," Intervest asserts that none of the occurrences that would trigger the clause occurred "with respect to the maker" because Intervest, as maker, never had ownership in its own right of the beneficial interest in the Land Trust. But that is sheer nonsense. Intervest executed and delivered the Note in the very transaction in which it acquired the beneficial interest in the Land Trust, acting in its capacity as general partner of the partnership purchasing that beneficial interest. There are several references throughout the Note stating what "Inland" intended to do by way of attempted refinancing of the Property for purposes of paying off the Note—clearly references to what Inland (now Intervest) would be doing not for its own account but in that selfsame general-partner capacity. It is wholly frivolous for Intervest, then, to contend that any later assignments of beneficial interest were not "with respect to the maker" in precisely the same sense. No ambiguity exists.

Intervest's second arrow is no more successful at finding the target than the first. It too is merely another attempt at word gamesmanship—or worse.

 Intervest claims that no "assignment of security ... interest in land trust" was made as phrased in the Note (D. Mem. 8, emphasis in original):

> While the limited partnerships may have *granted* a security interest, or assigned a *beneficial* interest, only a secured party may *assign* a *security interest* in the land trust.

To reject that position this Court need not focus at all on the assignment of the beneficial interest that first occurred on March 14, 1988—the one to Briarbrook Village. It will be remembered that Intervest suggests that it has other defenses to make as to that assignment as a Note-accelerating event (see n. 6).

But that does not help Intervest, for it must lose in any event because each of the admitted assignments of *security* interests (Answer ¶¶ 25, 29, 32) unquestionably triggered the Note's acceleration clause. Contrary to Intervest's empty contention, "as-signment" is not an ambiguous term and may also be expressed by use of the term "grant." "Assignment" is defined in *Black's Law Dictionary* 109 (5th ed. 1979) (citation omitted) as:

> A transfer or making over to another of the whole of any property, real or personal, in possession or in action, or of any estate or right therein. It includes transfers of all kinds of property, including negotiable instruments.

"Grant" is defined in these terms (*id.* at 629 (citations omitted)):

> To bestow; to confer upon some one other than the person or entity which makes the grant.
>
> * * * * * *
>
> A conveyance; ... A generic term applicable to all transfers of real property, including transfers by operation of law as well as voluntary transfers.

In the common meaning of the latter term, to "grant" a security interest is simply to bestow or transfer that interest.

 Intervest argues that a "grant" cannot be an "assignment" because assignments cannot *create* the security interest. Not so—"[a]n 'assignment' creates an interest in the property" (8A Thompson, *Commentaries on the Modern Law of Real Property* § 4459, at 334 (1963 replacement)). In fact, one of the very instruments of assignment that Intervest signed in this case gives the direct lie to its bogus argument in that respect—as already quoted, its own March 14, 1988 joinder in the collateral security assignment of that date was expressly stated to be "for the purposes of (i) *granting,* transferring, setting over and *assigning*" (Ex. I at 8, emphasis added) to Heller Financial, Inc. as lender the entire power of direction in the Land Trust. Although that document did not deal with the beneficial interest itself, what is significant for current purposes is that the document specifically confirms the interchangeability of "assignment" and "grant" in exactly the same sense that

Intervest now seeks to disavow.[9]

It is obvious (and unambiguously so) from the language of the Note's due-on-sale clause that its intention was to restrict the transfer of certain interests by accelerating the Note if any such transfer were made—and for that purpose a "grant" of a security interest has precisely the same effect as an "assignment." This Court therefore holds as a matter of law that the acceleration clause of the Note is not ambiguous.

### Mutual Mistake

 As to Intervest's claimed affirmative defense that there was a "mutual mistake with respect to the form of the note delivered" (D.Mem. 10), Intervest simply lays that egg without any effort to hatch it. There is no attempted explanation of Intervest's assertion by reference to any relevant facts or to the particular terms of the Note that purportedly involve any claimed mistake. In this diversity-of-citizenship case, the general applicability of the Rules to control matters of procedure (*Hanna v. Plumer*, 380 U.S. 460, 464, 85 S.Ct. 1136, 1140, 14 L.Ed.2d 8 (1965)) includes the specific mandate of Rule 9(b):

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

And as 2A Moore, Lucas & Grotheer, *Moore's Federal Practice* ¶ 9.03[1], at 9–26 (2d ed. 1990) (footnote omitted) tells us:

> In pleading mistake, the circumstances of the error must be set forth with the

same high degree of specificity. A good averment of mistake should include:

1. the act or writing intended;
2. the act or writing done;
3. the cause of the mistake; and
4. whether the mistake was mutual, unilateral, or merely that of a scrivener.

Intervest has not even approached that standard. Its purported affirmative defense therefore cannot survive a motion for judgment on the pleadings (see *Community Bank of Chillicothe, Missouri v. Chilvers*, 85 C 5592, slip op., 1985 WL 4062 (N.D.Ill. Nov. 21, 1985), holding that a defendant's affirmative assertion of mutual mistake failed to comply with Rule 9(b)).

### Lack of Consideration

 Intervest continues its effort to blaze a trail through the world of make-believe by also claiming that there was no consideration for the acceleration clause in the Note. Essentially its argument is that Intervest was already under an obligation to pay under the Contract, so that "[u]nder the preexisting duty rule, agreement to do what one is contractually obligated to do is not valid consideration" (*Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 208 (7th Cir.1985) (citations omitted)).

That too does no credit to Intervest or its lawyers, for the Note was *not* executed for payment of a pre-existing debt. It will be remembered that, although Venture and Inland–Briarbrook entered into the Con-

---

**9.** Indeed, the absurdity of Intervest's distorted reading of the due-on-sale clause, under which only an assignment of an *existing* security interest in the Land Trust (and not the *creation* of a security interest via an assignment of the beneficial interest by way of security) could trigger its operation, may best be seen by pursuing that reading to its "logical" conclusion. After all, the only party that could "assign" a secured interest in that sense would be the *secured* party, not the borrower (Intervest's principal). That would mean, then, that a secured party's sale of *its* interest (say by sale of its secured note and its beneficial-interest security to another investor)—a transaction over which Intervest would have absolutely no control and that would not alter the Noteholder's position or risk in the slightest—would be an event that caused the

Note to accelerate. It takes little if any imagination to conceive the anguished screams that would come (quite justifiably) from Intervest if *that* scenario had taken place and if the Note had immediately been called by its holder. To be sure, Intervest could argue that such a secured-party assignment would not be "with respect to the maker"—and *thus not within* the scope of the due-on-sale clause. But that would expose Intervest's basic position as patently bankrupt: It would mean that the Note's reference to an "assignment of security ... interest" could *never* have any applicability to any document (whether executed by Intervest or by a secured party). And of course it is black-letter law that a negotiated agreement will not be read in a fashion that renders one of its deliberately-inserted provisions totally without meaning.

tract on December 7, 1981 looking to the sale of the Property, its closing was conditioned on the satisfaction of a number of preconditions. That did not take place until over a year later, when HUD had approved the transfer, at which point the assignment of the beneficial interest in the Land Trust to Inland–Briarbrook was executed (on December 23, 1982) and the Note (dated December 15, 1982) was delivered.[10] By its own terms the Contract did not reflect a currently-closed sale, but rather a promise to sell in return for a promise to buy. Execution of the Note was expressly called for by Contract ¶ 2.4B. There was of course no need for separate consideration to be given in exchange for the Note.

 As for the due-on-sale clause in the Note, neither party has provided this Court with a copy of Contract Ex. D, which was the form of note initially called for by the Contract itself. For aught that appears, the parties to the Contract had from the beginning committed themselves to the selfsame due-on-sale provision.[11] But even were that not so (an assumption that is most favorable to Intervest), Intervest cannot complain of any lack of consideration by reason of a possible Note modification in that respect—for under Illinois law a contract modification that has been executed by the parties will not be disturbed by a court even in the absence of consideration (see, e.g., *Protective Insurance Co. v. Coleman*, 144 Ill.App.3d 682, 693, 98 Ill. Dec. 914, 922, 494 N.E.2d 1241, 1249 (2d Dist.1986) and cases cited there).

Intervest's lack-of-consideration argument thus fails both factually and legally. It too cannot forestall Cagan's collection on the accelerated Note.

### *Waiver*

 Finally, Intervest contends that the parties to the Note waived any provision in the Note providing for acceleration. Here is what its Ninth Affirmative Defense in the Answer says:

> The Receiver's predecessor-in-interest knew that the buyer would syndicate the property and that a separate entity was to be created for that purpose to which the property would be transferred either by Trustee's Deed or by assignment of the beneficial interest.

For this Court to adopt that statement (assumed to be true for purposes of this motion, see n. 6) as the basis for disregarding the due-on-sale clause entirely would once more fly in the face of basic contract principles. In general " 'the rights of the parties are limited to the terms expressed' in the contract" (*Consolidated Bearings Co. v. Ehret–Krohn Corp.*, 913 F.2d 1224, 1233 (7th Cir.1990), quoting and citing Illinois case law). As *Shea v. Preservation Chicago, Inc.*, 206 Ill.App.3d 657, 667, 151 Ill.Dec. 749, 756, 565 N.E.2d 20, 27 (1st Dist.1990) (citations omitted) states the principle:

> It is well recognized in Illinois that "if the contract imports on its face to be a complete expression of the whole agree-

**10.** Intervest's Answer ¶ 10 admits this allegation (among others) in Complaint ¶ 10:
> Although the Contract was negotiated in late 1981, the property did not close until December 1982 due to the necessity of complying with HUD's various regulations.

**11.** This Court's law clerk has inquired of the litigants about their ability to furnish copies of the exhibits to the Contract (including Ex. D, the agreed-upon form of note) to this Court. It appears that neither side has been able to locate a copy of those documents, which are presumably among the records of the defunct Gordon–Boula enterprises (both of those gentlemen are now serving long-term sentences in a federal penitentiary for their multiple fraudulent schemes). Because Intervest's purely conclusory statement as to lack of consideration is only

that, it is *not* one of the "well-pleaded factual allegations" that this Court must accept as true (*National Fidelity*, 811 F.2d at 358). It would seem that even on a Rule 12(c) motion such a wholly unsupported assertion of an affirmative defense (that is, a bare statement of a legal conclusion without a shred of factual backup)— a matter on which the defendant has the burden of production as well as persuasion—should have no effect. That means that Intervest and not Cagan would bear the adverse consequences of the total absence of a document that would be essential to show (if it were in fact true) that the due-on-sale clause was not part of the original documentation called for under the Contract. As the ensuing text makes plain, however, Intervest must lose whether or not that is the case.

ment, it is presumed that the parties introduced into it every material item and parole evidence cannot be admitted to add another term to the agreement."

This Court has no authority to delete the explicit acceleration clause in the Note simply because Intervest now claims that the clause does not accurately express the parties' intentions.[12] *West Suburban Mass Transit District v. Consolidated Rail Corp.*, 210 Ill.App.3d 484, ——, 155 Ill.Dec. 187, 191, 569 N.E.2d 187, 191 (1st Dist. 1991) (citation omitted) repeats familiar doctrine:

> A contract is to be interpreted according to its plain and ordinary meaning in order to give effect to the parties' intent, and the construction of the contract is a question of law to be resolved by the court. Where the contract's meaning is clear and unambiguous on its face, resort to extrinsic evidence to interpret the contract is unnecessary.

Here the due-on-sale clause is indeed "clear and unambiguous," and the Note contains no indication that the parties intended to waive that provision. This Court's obligation is to give full force and effect to that (as well as every other provision) of the Note.

Cagan's Rule 12(c) memorandum gives Intervest more than its due: It effectively converts Intervest's affirmative defense into an entirely different claim, posing the factual issue whether Cagan or its predecessor in interest knew of the assignments and intentionally waived the acceleration clause by not enforcing it until now.[13] Neither Cagan's nor Intervest's memoranda

can amend the pleadings (*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)). Intervest cannot reap the benefits of Cagan's suggestion of a different claim—one involving purported (but factually unsupported) knowledge *after* the negotiation of the Contract giving rise to the Note. Intervest has failed in its assertion of waiver at the time of that negotiation, or even later when the Note was signed and delivered.

### Conclusion

Intervest has been blowing smoke—and in a no-smoking area at that. It first assigned the beneficial interest in the Land Trust by way of security on March 14, 1988, thereby triggering the acceleration clause of the Note. It made another such assignment on February 15, 1990, with the identical result. Hence on the undisputed facts in the pleadings this Court finds Intervest liable to Cagan for full payment on the Note as a matter of law. Judgment is ordered to be entered on August 30, 1991, after Cagan provides the necessary information as to the amount of the judgment. To that end:

1. Cagan's counsel are ordered on or before August 19, 1991 to file in this Court's chambers and to deliver to Intervest's counsel a calculation of the amount of the judgment on the premise that it will be entered on August 30.[14]

2. Intervest's counsel are ordered on or before August 26 to file in this Court's chambers and to deliver to Cagan's counsel a response as to whether or not Cagan's calculation is accurate

---

**12.** It should be noted that even taking Intervest at its word as expressed in the just-quoted Ninth Affirmative Defense (as this Court has also done earlier in this opinion), and even ignoring the parol evidence considerations just referred to in the text, the purported understanding on the part of Cagan's predecessor in interest would except only the assignment to Briarbrook Village from the operation of the acceleration clause. Nothing in that claimed understanding would alter the triggering effect of the execution and delivery of the two *security* assignments as events that would mature the Note.

**13.** It is worth repeating that nothing before this Court suggests that either Cagan or Venture

knew of the assignments. As already noted, Intervest admits that it did not inform Venture of the refinancings or the assignments, and constructive notice principles do not apply.

**14.** No statement or estimate of the amount of Cagan's attorneys' fees has to be included in that calculation. Under *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199–203, 108 S.Ct. 1717, 1720–22, 100 L.Ed.2d 178 (1988) the noninclusion of such fees in the initial judgment, with a view to the later submission of a request for fees, does not impair the finality of the judgment.

and, if not, a statement of the basis for disagreement.