**Jacinto BERMUDEZ, Christine Hood, and Rafael Pedraza, Plaintiffs,**

v.

**FIRST OF AMERICA BANK CHAMPION, N.A., formerly known as Champion Federal Savings and Loan Association, Defendant.**

**No. 93 C 3653.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 11, 1994.

585

Daniel A. Edelman, Cathleen M. Combs, Tara Goodwin Redmond, James Eric Vander Arend, Michelle Ann Weinberg, Edelman & Combs, Chicago, IL, for plaintiffs.

Christine M. Drylie, McDermott, Will & Emery, Chicago, IL, John W. Allen, Lawrence J. Murphy, Howard & Howard Attorneys, P.C., Kalamazoo, MI, Leonard W. Sachs, Howard & Howard P.C., Peoria, IL, for defendant.

## *MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

Plaintiffs Jacinto Bermudez ("Bermudez"), Christine Hood ("Hood"), and Rafael Pedraza ("Pedraza") sue First of America Bank—Champion, N.A., f/k/a Champion Federal Savings & Loan Association ("Champion") under the Racketeer Influenced and Corrupt Organizations chapter of the Organized Crime Control Act of 1970 ("RICO"), 18 U.S.C. § 1964, and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* Plaintiffs have filed this action on behalf of a class of similarly situated consumers who purchased motor vehicles through contracts assigned to Champion.[1] In addition to these federal claims, plaintiffs invoke the court's supplemental jurisdiction under 28 U.S.C. § 1367 and sue Champion for breach of contract, violation of

---

**1.** Plaintiffs' oral motion for class certification was stayed on June 7, 1994, pending a ruling on defendant's motion to dismiss.

the Illinois Consumer Fraud Act, and violation of the Uniform Commercial Code. Champion moves to dismiss the federal claims for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. FED.R.CIV.P. 12(b)(1) and 12(b)(6).[2] In the event that the court grants Champion's motion to dismiss the two federal claims, Champion moves to dismiss the state law claims for lack of jurisdiction pursuant to Rule 12(b)(1) and 28 U.S.C. § 1367(c)(3).

## BACKGROUND

Plaintiffs' first amended complaint alleges the following facts which are taken as true on a motion to dismiss. See *Gillman v. Burlington N. R.R. Co.*, 878 F.2d 1020, 1022 (1989). Bermudez, Hood, and Pedraza each purchased an automobile and financed their purchase by means of a motor vehicle retail installment sales contract (the "Sales Contracts"). In each case, the sellers immediately assigned the Sales Contracts to Champion. The Sales Contracts were prepared on preprinted forms with Champion's name preprinted as assignee.

The Sales Contracts required plaintiffs to keep their vehicles insured against loss or damage.[3] The Sales Contracts also provide that if the buyer fails to maintain insurance on the vehicle, Champion may obtain insurance protecting the collateral against loss or damage.[4] The insurance obtained by Champion and charged to plaintiffs' balances is known as "force-placed" insurance. In addition to covering damage or loss to the vehicles, the force-placed insurance procured by Champion covered default by the plaintiffs on their payment obligations under the Sales Contracts. The Sales Contracts did not authorize Champion to procure or charge the plaintiffs for insurance against plaintiffs' default on their payment obligations.

The following well-pleaded allegations apply to the individual plaintiffs:

### Mr. Bermudez

Bermudez purchased a used vehicle in August 1987. Bermudez's Sales Contract was immediately assigned to Champion. In April or May of 1988, Champion added $1,556.00 to the balance due under Bermudez's Sales Contract—ostensibly for force-placed insurance against damage or loss to his vehicle. Bermudez did not pay the $1,556.00. Subsequently, on September 28, 1990, Champion repossessed Bermudez's vehicle claiming that Bermudez owed a principal balance of $2,742.50 including $1,556.00 for the force-placed insurance. On that same date, Champion sent Bermudez, via the United States mails, a form notice demanding payment of

---

**2.** The court declines Champion's invitation to consider matters outside the pleadings and to treat its motion as one for summary judgment under Rule 56.

**3.** Plaintiffs attached copies of their Sales Contracts to the Complaint. To the best of the court's ability to read the copies, the Sales Contracts provide as follows: **"Property Insurance:** Automobile physical damage or loss (property) insurance on the Motor Vehicle is required by Seller. Buyer may obtain property insurance from any person of the Buyer's choice that is acceptable to Seller." The backs of the Sales Contracts further provide:

> Buyer agrees to keep the Motor Vehicle fully insured against loss or damage by fire, theft, collision or any other cause for the entire term of this Contract by a company acceptable to the Assignee.,...

**4.** Pedraza's Sales Contract contains a "Notice of Requirement to Provide Insurance" which provides:

> I UNDERSTAND THAT I AM REQUIRED BY THE TERMS OF THIS LOAN TO PROVIDE ADEQUATE INSURANCE COVERAGE ON THE PROPERTY SECURING MY LOAN. THIS INSURANCE MUST BE AT LEAST COMPREHENSIVE, FIRE, THEFT AND $250 DEDUCTIBLE COLLISION AND THE POLICY MUST CONTAIN A LOSS PAYABLE CLAUSE ENDORSEMENT NAMING THE LENDER AS LIENHOLDER. THIS INSURANCE MUST REMAIN IN FORCE FOR THE ENTIRE TERM OF THE LOAN.
> I MAY OBTAIN A POLICY FROM AN AGENT OF MY CHOICE. IF I FAIL TO OBTAIN THE REQUIRED INSURANCE WITHIN 15 DAYS, THE LENDER MAY PURCHASE A POLICY FOR ITS OWN PROTECTION. THE COST OF THIS INSURANCE PLUS INTEREST CHARGES, IF ANY, WOULD BE ADDED TO THE BALANCE OF MY LOAN.

The court has not found this provision in Bermudez or Hood's Sales Contracts. Nevertheless, the court accepts as true Plaintiffs' allegation that the "contracts ... provide that if the consumer fails to maintain insurance on the vehicles, Champion may obtain insurance protecting the collateral against damage or loss."

$3,301.78 in order to recover his vehicle. This amount included the $1,556.00 and $114.13 "unpaid interest" on the insurance premiums. Bermudez did not comply with Champion's demand and Champion sold his car. Champion also mailed Bermudez several notices in connection with attempts to collect his outstanding balance (including the amount attributable to the force-placed insurance and interest thereon) both before and after the sale of his vehicle. As a result of Champion's conduct Bermudez suffered loss of his vehicle; injury to his credit; and creation of a fictitious indebtedness purportedly owed by him.

### Ms. Hood

In April or May of 1987 [5], Hood purchased a new automobile. Hood's Sales Contract was immediately assigned to Champion. Champion added sums [6] for forced-placed insurance to the balance due under Hood's Sales Contract. Hood did not pay the premiums. Champion mailed Hood several letters in connection with its attempts to collect payment for the force-placed insurance. In 1992, Champion demanded, by letters placed in the U.S. mail, that Hood refinance the amount of $7,850 including the force-placed insurance premiums and interest or finance charges on the premiums. Champion also threatened to retain its security interest in the vehicle until it was paid off. Champion mailed notices to Hood stating:

> THIS LETTER IS TO REMIND YOU THAT DURING THE COURSE OF THIS LOAN, A PREMIUM FOR PHYSICAL DAMAGE INSURANCE WAS PAID FOR BY CHAMPION FEDERAL SAVINGS AND LOAN ASSOCIATION. THE COST FOR THIS PREMIUM WAS CHARGED TO YOUR LOAN.... WHEN YOUR LOAN MATURES YOU WILL HAVE AN OUTSTANDING BALANCE OF THE INSURANCE PREMIUM PLUS ACCRUED INTEREST. YOUR VEHICLE TITLE WILL NOT BE RELEASED, AND YOUR LOAN PA-

PERS WILL NOT BE CANCELLED UNTIL THIS AMOUNT HAS BEEN PAID IN FULL.

Unaware that the force-placed insurance premiums for which she was being charged included coverage other than that for damage or loss to her vehicle, Hood agreed to Champion's demand that she refinance her account. Subsequently, Hood missed several payments and Champion repossessed Hood's car. Champion also sent Hood notices through the U.S. mail in connection with its attempts to collect the outstanding balance on Hood's vehicle after repossessing it. As a result of Champion's conduct, Hood suffered pecuniary loss including the payment of money that was not owed. In addition, she was induced to refinance the premiums for the unauthorized force-placed insurance resulting in additional cost. She was also injured by the loss of her vehicle, injury to her credit, and the creation of a fictitious indebtedness purportedly owed by her.

### Mr. Pedraza

Like Bermudez and Hood, Pedraza purchased a vehicle under a Sales Contract that was immediately assigned to Champion. Champion added substantial sums, ostensibly for force-placed insurance, to the balance due under Pedraza's Sales Contract. Pedraza did not pay the premiums. Champion subsequently repossessed Pedraza's vehicle. Champion mailed several notices to Pedraza in connection with the repossession of his vehicle and in an effort to collect on Pedraza's outstanding balance—including amounts attributable to the force-placed insurance. As a result of Champion's conduct Pedraza suffered loss of his vehicle, injury to his credit, and creation of a fictitious indebtedness purportedly owed by him.

### Additional Common Allegations

Champion did not provide copies of the force-placed insurance policies to plaintiffs. Champion sent, or authorized the sending via

---

**5.** The date cannot be discerned from the Sales Contract attached to the Complaint.

**6.** The precise amount is not clear from the Complaint. The Complaint alleges that Champion added the following amounts to Hood's balance:

(a) Effective July 18, 1988: $2,053; (b) Effective July 18, 1989: $2,046; (c) Effective July 18, 1990: $3,134. However, the Complaint notes that "[p]art, but not all, of the amounts listed may subsequently have been cancelled."

the United States mail, of a "Certificate of Insurance" to the plaintiffs. The contents of the certificate were agreed upon between Champion and the insurer (Transamerica). The certificate states: "This certificate covers direct and accidental loss or damage to the collateral as set forth on the following page." Nothing in the certificate suggests that the insurance policy covered default by the plaintiffs; however, in fact, the policy insured the policyholder against acts of default by the plaintiffs. The policy also provided insurance against mechanic's liens being placed on the vehicle as a result of work requested but not paid for by the plaintiffs and provided insurance against the cost of repossessing and storing the vehicles. The policy also insured against the plaintiffs absconding with or secreting the collateral.

Plaintiffs allege that it was the policy and practice of Champion:

 a. To demand payment for force-placed insurance that is not authorized by the Sales Contract;

 b. To misrepresent to consumers that the payment is solely demanded for insurance protecting the insured vehicle against loss or damage;

 c. To use the United States mails to transmit the payment demand notices;

 d. To refinance the consumers' purported obligations to pay for the force-placed insurance;

 e. To use the United States mails in connection with the refinancing of the consumers' purported obligations;

 f. To repossess vehicles from consumers who decline to pay for the force-placed insurance, or to refinance their purported obligations;

 g. To use the United States mails to transmit the notices that must be issued in order to transfer title to repossessed vehicles to Champion.

Champion moves to dismiss the RICO count (Count I) arguing that plaintiffs lack standing to maintain a RICO action because they have not incurred injury to their business or property. More precisely, Champion contends that its conduct did not proximately cause plaintiffs' alleged injuries. Champion

also argues that the RICO count is barred by the statute of limitations. Additionally, Champion contends that plaintiffs fail to state a cause of action under RICO because they fail to allege adequately that Champion engaged in a scheme to defraud and they fail to allege adequately that Champion engaged in a pattern of racketeering activity. Champion moves to dismiss the TILA count (Count II) arguing that it is barred by the statute of limitations and arguing that charges for actual unanticipated default are not finance charges subject to TILA disclosure requirements. Additionally, Champion moves to dismiss both Count I and Count II contending that these counts are preempted by the McCarran–Ferguson Act. 15 U.S.C. § 1012(b). Finally, in the event that the court dismisses plaintiffs' federal question causes of action, Champion argues that the state law causes of action should be dismissed for lack of subject matter jurisdiction.

### DISCUSSION

*Standard of Review*

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Ass'n, Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). The only question is whether relief is possible under any set of facts that could be established consistent with the allegations. *Bartholet v. Reishauer A.G.,* 953 F.2d 1073, 1078 (7th Cir.1992), *citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). All well-pleaded facts are taken as true, all inferences are drawn in favor of the plaintiff and all ambiguities are resolved in favor of the plaintiff. *Dawson v. General Motors Corp.,* 977 F.2d 369, 372 (7th Cir.1992).

Unless otherwise provided by Rule 9 of the Federal Rules of Civil Procedure, the underlying facts of the lawsuit need not be set out with particularity. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* —— U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). The federal system of notice pleading does not favor dismissal for failure to state a claim. *Gray v. County of Dane,* 854 F.2d 179, 182 (7th Cir.1988). In

short, the complaint may be properly dismissed only if a plaintiff pleads him or herself out of court by alleging facts that show he or she is not entitled to judgment. *Bartholet,* 953 F.2d at 1079.

## I. *Preemption of Plaintiffs' Federal Claims by the McCarran–Ferguson Act*

The McCarran–Ferguson Act ("McCarran–Ferguson" or "the Act"), 15 U.S.C. § 1012 *et seq.,* was enacted in reaction to the Supreme Court decision in *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) (holding insurance transactions subject to federal regulation under the commerce clause). The Act was an attempt to "assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation." *SEC v. National Securities, Inc.,* 393 U.S. 453, 459, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969).

Champion contends that plaintiffs' RICO and TILA claims are preempted by section 2(b) of the Act, which provides, in pertinent part, as follows:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b).

■ The Act leaves regulation of "the business of insurance" to the states unless Congress enacts legislation specifically relating to the "business of insurance." A proper determination regarding preemption under the Act requires consideration of four separate issues: (1) does the federal law in question specifically relate to the business of insurance; (2) does the challenged conduct constitute the business of insurance; (3) does state law regulate the challenged conduct; and (4) would application of the federal law invalidate, impair, or supersede the state scheme that regulates the challenged conduct. *See Cochran v. Paco, Inc.,* 606 F.2d 460, 464–66 (5th Cir.1979); *Washburn v. Brown,* 1986 WL 7062 (N.D.Ill.1986). Because neither RICO nor TILA specifically relate to the business of insurance, *see Coch-*

*ran v. Paco, Inc.,* 606 F.2d at 464 (TILA); *Washburn,* 1986 WL 7062 (RICO); *First Nat. Bank v. Sedgwick James of Minnesota, Inc.,* 792 F.Supp. 409, 418 (W.D.Penn.1992) (RICO), we turn to a consideration of the remaining factors.

■ To begin, the court shall determine whether Champion's challenged practices—namely, procuring allegedly unauthorized insurance and charging plaintiffs for that insurance—are a part of "the business of insurance." If the practices are not a part of the "business of insurance," preemption is not proper and our analysis need not proceed any further. In describing the meaning of the expression "business of insurance," the Supreme Court stated:

The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." ... Whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

*SEC v. National Securities, Inc.,* 393 U.S. at 460, 89 S.Ct. at 568–569.

The Court identified three criteria relevant to determining whether a particular practice is part of the "business of insurance" in *Group Life & Health Ins. Co. v. Royal Drug Co., Inc.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), and summarized those factors in *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), as follows:

*first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry. None of these criteria is necessarily determinative in itself....

*Id.* at 129, 102 S.Ct. at 3009. Examining Champion's practice of charging plaintiffs for

allegedly unauthorized insurance coverage, the court has little difficulty in concluding that the practice is not a part of "the business of insurance."

■ Champion's practice of charging plaintiffs for allegedly unauthorized insurance coverage does not involve the transferring or spreading of Champion's risk. The transferring and spreading of Champion's risk of default by borrowers was completed when Champion entered into an insurance contract with Transamerica. *See Pireno,* 458 U.S. at 130, 102 S.Ct. at 3009 ("The transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that the contract is entered.") Champion's practice of passing on the cost of the premiums to the plaintiffs is logically and temporally unconnected with the transfer and spreading of the risk of default accomplished by the Transamerica policy. The court cannot accept Champion's argument that the act, by an insured, of transferring the cost of an insurance premium sometime after procuring an insurance contract, constitutes the "spreading and underwriting of a policyholder's risk" that is the "indispensable characteristic of insurance." *See Royal Drug,* 440 U.S. at 211–212, 99 S.Ct. at 1073.[7]

Second, Champion's practice of charging plaintiffs for allegedly unauthorized insurance coverage is not an integral part of the policy relationship between the insurer and the insured. Accepting as true (which the court must on a motion to dismiss) plaintiffs' allegations that the Sales Contracts do not authorize Champion to purchase insurance against default by its borrowers and that the borrowers were not "insureds" under the Transamerica policies, it is evident that Champion's practice of procuring such insurance and passing on the cost of the premiums to the borrowers does not implicate the policy relationship between Champion and Transamerica. Champion's arrangements for charging plaintiffs for the cost of the premiums were not arrangements between "insurer" and "insured." At most, the arrangements involved separate contractual relationships between Champion and its borrowers. Champion's practices in passing on the cost of its insurance against the borrowers' default simply are not an integral part of the policy relationship between Champion and Transamerica; certainly, it is of no concern to Transamerica who pays Champion's premiums.

■ With respect to the third *Royal Drug* criterion, it is plainly evident that the challenged practices are not limited to entities

7. Champion cites *Gordon v. Ford Motor Credit Co.,* 1992 WL 687856, 1992 U.S.Dist.LEXIS 13688 (N.D.Ca.1992), as authority for the proposition that its challenged conduct does constitute the business of insurance and that McCarran–Ferguson preemption is proper. With some small exceptions (some significant others not), *Gordon* presents essentially the same facts as presented here. The plaintiffs in *Gordon* challenged Ford Motor Credit Company's ("FMCC") force-placed insurance practices on essentially the same grounds asserted here:

> FMCC procures and charges the borrower for insurance coverages in addition to collision and comprehensive insurance which benefit FMCC. The material facts relating to the purchase of these additional coverages are concealed from borrowers. FMCC does not inform borrowers of the existence of, the terms of, or the premium charges attributable to the additional insurance coverages. Nor does FMCC disclose to borrowers that it is procuring the insurance from the subsidiary at inflated rates set by FMCC.

*Gordon,* 1992 WL at *6 n. 2, 1992 U.S.Dist.LEXIS at *3–*4 n. 2. The *Gordon* court concluded that the challenged practices were part of the business of insurance. This court respectfully believes that *Gordon* was incorrectly analyzed and therefore respectfully declines to follow that analysis. We believe that the *Gordon* court painted with too broad a brush when it accepted the defendant's characterization of the gravamen of the complaint as "Challen[ing the defendant's] collateral protection insurance practices—an area delegated by Congress to regulation by the states." *Gordon,* 1992 WL at *4, 1992 U.S.Dist.LEXIS at *12. As *Gordon* recognized, the court's inquiry "must focus on the nature of the activities or practices alleged in a given action," *id.,* 1992 WL at *3, 1992 U.S.Dist.LEXIS at *9, not a question-begging characterization of those activities; it is not at all clear to this court that Congress delegated all aspects of a lender's collateral protection insurance practices to state regulation regardless of how remotely those practices relate to the core aspects of the "business of insurance" or to the relationship between insurer and insured. The practices challenged in this action are quite peripheral to the insurance

within the insurance industry. Champion is not in the insurance industry. The fact that the unlawful practices alleged in the instant case involve a scheme for passing on the cost of insurance premiums does not convert this case into one limited to the insurance industry.[8] Indeed, the insurance industry is an innocent party whose involvement is merely by happenstance. If Champion were alleged to be passing on the cost of some capital investment, for example an investment in its computers, we would not conclude that the practice involved the computer industry.

For the foregoing reasons the court concludes that the challenged practices in the instant suit do not involve the "business of insurance." Given this conclusion, the court need not consider the other factors relevant to preemption in order to hold that the McCarran–Ferguson Act does not preempt plaintiffs' federal claims.

## II. *Challenges to Plaintiffs' RICO Claims*

### A. *Plaintiffs' standing*

■ Plaintiffs allege claims under Section 1964(c) of the Racketeer Influenced and Corrupt Organizations chapter of the Organized Crime Control Act of 1970 ("RICO"), 18 U.S.C. § 1964(c). RICO's provision for civil enforcement provides as follows:

contract and can hardly be said to lie at the center of the legislative concern underlying McCarran–Ferguson.

8. In concluding that the third *Royal Drug* criterion was satisfied in the case before it, the *Gordon* court stated:

While [the defendant] could have acquired funds for purchasing the undisclosed policies by misrepresenting charges unrelated to insurance, the Complaint before this court alleges that revenues were generated by misrepresentations regarding the rates and coverages of automobile insurance policies.

*Gordon,* 1992 WL 687856 at *6 n. 13, 1992 U.S.Dist. LEXIS at *17 n. 13. This court believes that the fact that Champion "could have acquired funds for purchasing the undisclosed policies by misrepresenting charges unrelated to insurance" demonstrates just how incidental insurance is to this case. Moreover, although the case involves misrepresentations regarding the rates and coverages of policies covering damage and loss to plaintiffs' vehicles, these misrepresentations took place in a context separate and distinct from the sale or purchase of insurance; rather, they took place in the context of Champi-

Any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold for the damages he sustains and the cost of the suit, including a reasonable attorney's fee. 18 U.S.C. § 1964(c). Thus, "[i]f the defendant engages in a pattern of racketeering activity [as defined by § 1962], and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985). The defendant's racketeering activity must also be the proximate cause of the plaintiff's injuries. *Holmes v. Securities Investor Protection Corp.,* —— U.S. ——, ——, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532, 544 (1992).

■ Plaintiffs uniformly allege that as a result of Champion's conduct, they suffered: loss of their vehicles, injury to their credit, and the creation of a fictitious indebtedness. Hood further alleges that she suffered injury by being induced to refinance her insurance premiums and paying money on the refinanced premiums. Champion does not dispute that repossession of plaintiffs' vehicles and payment of money for unauthorized premiums constitute compensable injuries under RICO.[9] Champion contends, however, that

on's efforts to pass on the costs of its policy to a noninsured third-party.

9. With respect to plaintiffs' alleged injuries, Champion argues that "only the repossession of Plaintiffs' vehicles and the payment of money could constitute proper elements of RICO damages." Brief in Support of Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint ("Defendant's Brief") at 8. Because it is clear that plaintiffs have alleged *some* injuries that are compensable under RICO, the court need not resolve, for purposes of this motion, whether *all* of the alleged injuries are compensable. It should be noted, however, that RICO has been found to provide redress for a broad range of tangible and intangible proprietary injuries. *See e.g., County of Oakland v. City of Detroit,* 866 F.2d 839, 847 (6th Cir.1989), *cert. denied,* 497 U.S. 1003, 110 S.Ct. 3235, 111 L.Ed.2d 747 (1990) (payment of unlawfully inflated price); *Alexander Grant & Co. v. Tiffany Indus., Inc.,* 742 F.2d 408, 411 (8th Cir.1984), *vacated and remanded,* 473 U.S. 922, 105 S.Ct. 3551, 87 L.Ed.2d 673 (1985), *on remand,* 770 F.2d 717 (8th Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 799, 88 L.Ed.2d 776 (1986) (loss of business reputation and other injuries); *Alcorn County v. U.S. Interstate Supplies, Inc.,* 731 F.2d 1160,

none of the injuries alleged by plaintiffs were proximately caused by its conduct.

■ Both Bermudez and Pedraza admit in the Complaint that they did not pay the amounts added for the collateral protection insurance to their respective balances due. Champion argues that this constitutes an admission that these plaintiffs have not suffered injury. However, RICO does not require that the plaintiffs suffer out-of-pocket losses. As Champion recognizes, the repossession of plaintiffs' vehicles constitutes a compensable RICO injury.

■ Champion contends that its conduct was not the proximate cause of the repossession of plaintiffs' vehicles. With respect to Pedraza, Champion argues that since Pedraza paid no part of the insurance premiums, "the repossession of his car was not proximately caused by his failure to pay the portion of the insurance premium for the allegedly unauthorized coverage; rather his failure to pay the portion of the insurance premium which he admits he owed proximately caused the repossession." Defendant's Brief at 10. With respect to Hood, Champion acknowledges that Hood did pay a portion of the insurance premiums charged to her account, but Champion argues that Hood "fails to allege that she paid any portion of the insurance premium for the indisputably authorized coverage." Id. These arguments are unpersuasive at this time because of the procedural status of this lawsuit. The record properly before the court on defendant's motion to dismiss does not permit a parcelling of the charges for force-placed insurance premiums into authorized and unauthorized components. It may be reasonably inferred from the Complaint that unitary charges were added to plaintiffs' balances for the costs of the force-placed insurance. Plaintiffs must be given the opportunity, upon a fuller development of the facts, to establish that there was no mechanism available to them by which to parcel the charges into authorized and unauthorized charges.

■ With respect to Bermudez, Champion contends that the Complaint reveals on its face that at the time Bermudez's car was repossessed, the outstanding balance on his Sales Contract was $2,742.50, of which only $1,556.00 was attributable to the force-placed insurance premiums. Thus, Champion contends that wholly apart from the unpaid insurance premium charges, Bermudez was in default on a balance of at least $1,186.50 and because of *this* default Bermudez "has not alleged 'a direct relation between the injury asserted and the injurious conduct alleged.'" Defendant's Brief at 10, quoting *Holmes v. Securities Investor Protection Corp.,* —— U.S. ——, ——, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532, 549 (1992). The court cannot agree that Bermudez has pleaded himself out of court by alleging facts revealing that he was in default in an amount greater than that which is attributable to the charges for the force-placed insurance premiums. It is entirely possible that Bermudez could establish facts proving that Champion would not have repossessed his vehicle were it not for the fact that his outstanding balance was so great—due, in part, to the charge for force-placed insurance premium. Conversely, it is possible that Bermudez could establish facts proving that Champion required him to pay the amount due for force-placed insurance as a condition to not repossessing and selling his vehicle. In this regard the court notes that the Notice of Sale and Right to Recover Vehicle sent to Bermudez by Champion and attached to the Complaint as Exhibit B states: "You have a right to redeem this vehicle on or before the date of sale. To get your vehicle back, you will have to pay the whole amount you owe, plus expenses." Resolving all inferences in favor of Bermudez for purposes of this motion, the court could find that Champion conditioned the return of Bermudez's car on payment of the force-placed insurance premiums.

■ Champion makes two additional arguments relating to plaintiffs' standing and the issue of proximate cause that need not detain us long. First, apparently in an at-

1169 (5th Cir.1984) (cost of unauthorized purchases at inflated prices); *Sound Video Unlimited, Inc. v. Video Shack Inc.,* 700 F.Supp. 127, 136 (S.D.N.Y.1988) (genuine issue of material fact as

to whether injury to credit rating constituted injury); *Ford Motor Co. v. B & H Supply, Inc.,* 646 F.Supp. 975, 999 (D.Minn.1986) (injury to reputation and goodwill).

tempt to argue that plaintiffs suffered no injury as a result of Champion's conduct in charging plaintiffs for unauthorized coverage, Champion contends that its conduct actually benefitted plaintiffs. Champion argues that Hood and Pedraza benefitted because they made claims and received payments covering damage to their vehicles under Champion's policy. This argument is unavailing for two reasons. First, the argument relies on matters outside the pleadings which are not properly before the court on this motion to dismiss. Second, even if the court were to find that Hood and Pedraza received payment on claims filed under the policy Champion procured, such a determination would be irrelevant. The wrongful conduct alleged in the Complaint is not that Champion procured insurance covering loss or damage to plaintiffs' vehicles; rather, the alleged wrongful conduct relates to Champion's conduct in procuring a policy that insured Champion, *inter alia*, against default by the plaintiffs. This alleged conduct conferred no benefit to Hood and Pedraza.

■■■ Champion argues that Bermudez benefitted because when Champion repossessed and sold his vehicle, Champion was required, under Illinois' Motor Vehicle Retail Installment Sales Act, 815 ILCS 375/20, to forgive the outstanding balance on Bermudez's Sales Contract. Champion contends that because the amount due on Bermudez's debt (after the proceeds from the sale of the vehicle were applied to the debt) exceeded his equity in the vehicle, Champion's repossession of the vehicle conferred a pecuniary benefit on Bermudez. This argument is unavailing for several reasons. First, documents attached to the Complaint reveal that after it sold Bermudez's vehicle, Champion continued its efforts to collect payment on Bermudez's outstanding balance. Second, it is impossible to determine from the record properly before the court whether Champion's accounting analysis of the repossession is correct because there is no way to determine whether the proceeds received from the sale of the vehicle accurately reflect the vehicle's fair market value. Third, even assuming that Champion's accounting analysis of the repossession transaction is correct, the repossession of Bermudez's vehicle constitutes a com-

pensable injury to Bermudez by virtue of Bermudez's loss of the utility of the vehicle and the costs associated with the loss of that utility.

■■■ Champion's final argument regarding proximate cause is that Plaintiffs, not Champion, proximately caused their own injuries by failing to maintain insurance coverage on the vehicles. Champion argues that had the plaintiffs not breached the terms of their Sales Contracts by failing to maintain insurance, no force-placed insurance premiums would have been added to their loan balances. Champion's argument side-steps the fact that plaintiffs do not complain about the fact that Champion purchased insurance and charged the premiums to plaintiffs' accounts, rather plaintiffs complain that Champion purchased unauthorized coverage and then overcharged plaintiffs by passing on the cost of the unauthorized coverage to them. While plaintiffs' failure to maintain insurance may have been the proximate cause of the purchase of authorized coverage by Champion, it cannot be said that plaintiffs proximately caused the purchase of unauthorized coverage and the subsequent overcharging.

Accordingly, the court rejects Champion's proximate cause and standing arguments and denies Champion's motion to dismiss Count I on those grounds.

### B. *RICO statute of limitations*

■■■ A statute of limitations provides an affirmative defense. *Tregenza v. Great American Communications Co.*, 12 F.3d 717, 718 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994). A plaintiff need not allege facts negating the affirmative defense; if, however, the plaintiff pleads facts establishing that the complaint is untimely, he or she will plead him or herself out of court. *Id.*

■■■ Champion contends that plaintiffs' RICO claim is barred by the four-year statute of limitations governing civil RICO actions, *see Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987), and that plaintiffs have pleaded themselves out of

court. A RICO cause of action accrues "once there was a RICO violation and the plaintiffs knew or should have known that they were injured." *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464 (7th Cir.1992). Plaintiffs allege that they did not learn, and had no reason to learn, that the insurance procured by Champion covered anything other than the interests of Champion in the collateral until February 1993, when they obtained documents revealing the additional coverage. Thus, the Complaint, filed in June 1993 by Bermudez and Hood, and in September 1993 by Pedraza, would be timely filed.

■ Champion contends that Bermudez and Hood knew or should have known that they sustained the injuries of which they complain in 1988, and that Pedraza knew or should have known of his injuries in March of 1989, when plaintiffs received Certificates of Insurance (the "Certificates") from Transamerica Premier Insurance Company.[10] Champion argues that certain language contained within the Certificate should have put plaintiffs on notice that the Transamerica policy to which the Certificates referred provided coverage beyond damage to the collateral. In response, plaintiffs allege that the Certificates provided no reason to suspect that Champion had obtained, or was charging for, anything other than loss or damage coverage as authorized by the Sales Contract.[11]

10. Certificates issued to Bermudez and Hood are attached as Exhibits P and Q to plaintiffs' Complaint. The Complaint alleges that Pedraza also received such Certificates. Written instruments that are exhibits to a pleading are considered part of the pleading for all purposes. FED. R.CIV.P. 10(c); *see also Cagan v. Intervest Midwest Real Estate Corp.*, 774 F.Supp. 1089, 1091 n. 2 (N.D.Ill.1991) (exhibits considered part of the pleadings on motion to dismiss). Thus, matter contained in the exhibits may be considered in determining whether the plaintiff has pleaded him or herself out of court.

11. Plaintiffs also allege that the Certificates were calculated to convey the impression that Champion had merely procured that insurance which was authorized by the Sales Contract. Finally, plaintiffs allege that the contents of the Certificates were agreed upon by Champion and Transamerica, that Champion sent or authorized the sending of the Certificates, and that the sending of the Certificates served to fraudulently conceal Champion's misconduct. These allegations are

To examine the merit of Champion's argument, we turn to an examination of the Certificates. Item 5 of the declarations page specifically describes the coverage as "direct and accidental loss or damage *to the collateral* as set forth on the following page." (emphasis added) The following page describes the policy's "all risk physical damage coverage" as covering "all risks of direct and accidental physical loss *to the collateral.*" (emphasis added). Notwithstanding this language, Champion argues that plaintiffs should have been alerted to coverage beyond damage to the collateral because: (1) the Certificate describes itself as a "condensed version" of the lender's policy that does not include all the limitations and terms of the lender's policy[12]; (2) the Certificate refers to a Master Policy of Insurance issued to the lender and states that coverage under the Certificate "protects the interests of the lender only" and does not protect [the borrower's] interest or equity[13]; and the Certificate states:

THIS IS A LIMITED CERTIFICATE THAT DOES NOT PROVIDE BODILY INJURY OR PROPERTY DAMAGE LIABILITY INSURANCE AND IT DOES NOT COMPLY WITH THE FINANCIAL RESPONSIBILITY LAW OF ANY STATE. THIS CERTIFICATE DOES NOT PROVIDE "NO FAULT" INSURANCE.

relevant to the issues of equitable estoppel and tolling of the statute of limitations. However, because the court finds that the RICO claims were timely filed, it need not address these allegations at this time.

12. Specifically, the Certificate provides:

This Certificate was issued because the lender did not receive the required evidence of insurance on the described collateral. Coverage under this Certificate protects the interest of the lender only and does not protect your interests

The following is a condensed version of the policy issued to the lender. It DOES NOT include all the limitations and terms of the lender's policy. You can look at the policy at the lender's address shown in Item 2 of the declarations.

13. Just before the quoted passage, on the declarations page, the Certificate, provides, "This insurance protects the interest of the Lender *in the collateral.*" (emphasis added).

None of these provisions, taken alone or collectively, provide notice of any coverage beyond damage to the collateral. The statement that the Certificate is a condensed version of the policy and that there are additional *terms* and *conditions* does not suggest to the ordinary consumer that there is *coverage* beyond that described in the certificate. Similarly, the statement that the insurance "protects the interest of the lender only" must be read in conjunction with the preceding statement that the insurance "protects the interest of the Lender *in the collateral.*" (emphasis added) From this language the borrower is put on notice only that the insurance is intended not to protect his or her equity in the vehicle but rather to protect the lender's interest in the collateral. No indication is provided by this language that the lender's policy covers loss beyond that occasioned by damage to the collateral. Finally, the Certificate's statement that the insurance does not "provide bodily injury or property damage liability insurance and does not comply with the financial responsibility law of any state" is entirely irrelevant. This statement merely informs the borrower that the lender's policy will not satisfy state financial responsibility requirements. Of course, this should come as no surprise to the borrowers somehow alerting them that something is amiss; after all, the lender's policy was designed to protect only its interest in the collateral *not* the borrowers' liability for injury to the body or property of others.

In sum, for purposes of ruling on Champion's motion to dismiss, the court finds that the Certificates mailed to plaintiffs did not, as a matter of law, serve to put plaintiffs on notice of Champion's alleged misconduct. Because the court cannot conclude as a matter of law that the plaintiffs should have appreciated the need for further inquiry into the alleged misconduct prior to obtaining documents revealing the additional coverage in February 1993, the court finds that plaintiffs' claim is timely and denies Champion's motion to dismiss Count I as time barred.

## C. Failure to state a claim under RICO

Plaintiffs claim that Champion violated section 1962(c) of RICO. A violation of this section requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted).

Plaintiffs allege that Champion engaged in numerous acts of mail fraud in connection with its practice of procuring unauthorized insurance and charging plaintiffs for that insurance. Mail fraud falls within RICO's definition of "racketeering activity." 18 U.S.C. § 1961(1)(B). Mail fraud requires intentional participation in a scheme to defraud, use of the mails in furtherance of that scheme, and a specific intent to defraud. *See Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Champion contends that plaintiffs have not adequately alleged the predicate acts of mail fraud because "plaintiffs expressly authorized Champion to purchase collateral protection insurance for 'its own protection' and to add the cost of the insurance to the outstanding balance on their respective Contracts." Defendant's Brief at 36. Accordingly, Champion argues that its efforts to collect payment from plaintiffs for the insurance it purchased cannot constitute acts in furtherance of a scheme to defraud.

The court has carefully reviewed the Sales Contracts and the Notice of Requirement to Provide Insurance and cannot find as a matter of law that these documents authorized Champion to purchase insurance in addition to that for damage or loss to the vehicles and to charge plaintiffs for the additional coverage. The documents are, at best, ambiguous and their meaning must be determined by the finder of fact upon a more complete development of the record.[14] In

---

14. Champion places much emphasis on the fact that the "Notice of Requirement to Provide Insurance" states, "If I fail to obtain the required insurance ... the lender may purchase a policy for its own protection." Champion's reading of this provision appears to be that Champion was granted *carte blanche* to purchase any policy providing any and all types of protection. The court cannot agree with this construction of the quoted language. Under Champion's construction, Champion could have purchased property insurance protecting its buildings and passed the

view of this ambiguity, the court must accept as true plaintiffs' allegations that: (1) the documents did not authorize Champion to procure or charge the consumer for insurance against the default of the consumer on his or her financial obligations under the Sales Contract; (2) Champion used the mails in furtherance of a fraudulent scheme to collect payment for the unauthorized coverage and to effect the repossession and transfer of title to vehicles from those who declined to pay for the unauthorized insurance; and (3) Champion engaged in these practices over a period of at least 5 years and with respect to numerous consumers. Accordingly, the court finds that plaintiffs have sufficiently alleged that defendants engaged in a scheme to defraud.

 Champion also argues that plaintiffs fail to state a claim under RICO because they have failed to adequately allege that Champion engaged in a "pattern" of racketeering activity. The Supreme Court has indicated that criminal conduct forms a "pattern" for purposes of RICO "if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. More recently, the Court, quoting RICO's legislative history, noted that:

> Congress had a fairly flexible concept of pattern in mind. A pattern is not formed by "sporadic activity".... Instead, the term pattern itself requires the showing of a relationship between the predicates and the threat of continuing activity. It is this factor of *continuity plus relationship* which combines to produce a pattern.

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (internal quotations and citations omitted). Thus, it is often said that a plaintiff must establish "relationship plus continuity." The Court explained further that the concept of pattern involves whether the predicate acts bear some relationship to one another or to some external organizing principle (the "relationship" requirement), *id.* at 238, 109 S.Ct. at 2900, and that the continuity requirement may be "satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business." *Id.* at 243, 109 S.Ct. at 2902. In *H.J. Inc.*, the Supreme Court reversed the Rule 12(b)(6) dismissal of a RICO claim which alleged that at different times over at least a six month period, the defendant's successfully bribed certain officials in order to win approval of unfair and unreasonable utility rates. The Court observed that the acts of bribery could be found to be related by a common purpose and that the allegations that the acts occurred with some frequency over at least a six month period, may be sufficient to satisfy the continuity requirement. *Id.* at 250, 109 S.Ct. at 2906.

 The Seventh Circuit uses a multifactor analysis in determining whether the alleged conduct constitutes a pattern. Among the factors are the number and variety of predicate acts, the length of time over which they were committed, the number of victims, the presence of separate schemes [15], and the occurrence of distinct injuries. *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48, 50 (7th Cir.1989). No one factor is determinative, *id.*, and the analysis requires a case-by-case examination of the specific facts presented. *Sutherland v. O'Malley*, 882 F.2d 1196, 1204 (7th Cir.1989); *Brandt v. Schal Assocs., Inc.*, 854 F.2d 948, 952 (7th Cir.1988).

Taking the allegations of the Complaint as true, Champion's conduct occurred over at

---

charge on to the borrowers. The court cannot and need not countenance such a reading of this language. *See Chicago Bd. of Options Exchange, Inc. v. Connecticut Gen. Life Ins. Co.*, 713 F.2d 254 (7th Cir.1983) (court need not follow a literal interpretation of a contract where it would lead to an unreasonable or absurd result).

**15.** In light of *H.J. Inc.*'s holding that plaintiffs need not allege more than one scheme to satisfy the pattern requirement, 492 U.S. at 239–43, 109 S.Ct. at 2900–2903, the existence of multiple schemes may, at most, be relevant to the finding of a pattern, but it is not required. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48, 51 (7th Cir.1989) (suggesting that the focus on separate schemes may no longer be useful in analyzing the pattern requirement).

least five years and may have injured thousands of victims. The injuries suffered by the plaintiffs include repossession of their vehicles and overpayment of money. The mails were used on multiple occasions for several purposes (*e.g.,* to mislead the plaintiffs as to the nature of the insurance procured by Champion, to collect payment on the premiums for the unauthorized insurance, to effect the repossession of plaintiffs' vehicles, to effect refinancing of the payments owed for the unauthorized insurance).

In light of these allegations a jury could find that the relationship requirement is met. " '[R]elationship implies that the predicate acts were committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct.' " *J.D. Marshall Int'l, Inc. v. Redstart, Inc.,* 935 F.2d 815, 820 (7th Cir.1991), quoting *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986). In the instant case, the Complaint can plainly be read to allege that the predicate acts of mail fraud involved the same type of misconduct related by a common purpose thereby satisfying the relationship element.

■ As previously noted, the Supreme Court has indicated that the continuity requirement may be "satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J. Inc.,* 492 U.S. at 243, 109 S.Ct. at 2902. Again, plaintiffs clearly allege that the conduct complained of constituted Champion's normal ongoing practices—as opposed to a sporadic or isolated event—and a factfinder could find that these practices occurred over a period a several years, involved separate transactions, and injured a great number of individuals, thus posing a threat of continued criminal activity.

*Talbot v. Mathews Distributing Co.,* 961 F.2d 654 (7th Cir.1992), cited by Champion, does not compel a contrary conclusion. *Talbot* involved a RICO claim brought by over thirty plaintiffs alleging that the defendants had conspired to eliminate the plaintiffs' jobs through a series of service contracts and labor agreements. The Seventh Circuit affirmed the dismissal of the RICO claim finding that the allegations failed to establish a

sufficient pattern of racketeering activity. *Id.* at 663. Champion seizes on the *Talbot* court's summary of the allegations: "the allegations involve multiple acts of mail fraud in furtherance of a single scheme—to deprive plaintiffs of their employment—and resulted in nondistinct injuries," *id.,* and suggests that this case should be disposed of in a similar fashion. The *Talbot* court did not explicitly explain why it found the allegations insufficient but a fair reading of that case suggests that the defendants' labor practices *vis-a-vis* the plaintiffs were an isolated event posing no genuine threat of continued criminal activity. The instant case differs in this regard; here the allegations can support a finding of continued threat to a large number of alleged victims who may suffer distinct injuries.

For the foregoing reasons, the court finds that plaintiffs have sufficiently alleged facts supporting a claim under RICO.

III. *Challenges to Plaintiffs' TILA Claims*

A. *TILA statute of limitations*

■ TILA actions are subject to a one-year statute of limitations. 15 U.S.C. § 1640(e). The limitations provision provides as follows:

**Jurisdiction of courts; limitations on actions**

Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.

15 U.S.C. § 1640(e).

■ Champion argues that Plaintiffs' TILA claims—originally filed by Bermudez and Hood on June 18, 1993, and originally filed by Pedraza on September 22, 1993—are time barred because the alleged violations involve collateral protection insurance charged to Bermudez and Hood's loan balance in 1988, and charged to Pedraza's loan balance in 1989. Plaintiffs seek to avoid the effect of section 1640(e)'s one-year limitation by invoking the "fraudulent concealment" doctrine which is a subset of the "equitable estoppel" doctrine. *Singletary v. Continental Illinois Nat. Bank & Trust Co.,* 9 F.3d

1236, 1241 (7th Cir.1993). "Equitable estoppel suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing, as by promising the plaintiff not to plead the statute of limitations pending settlement talks or by concealing evidence from the plaintiff that he needed in order to determine that he had a claim." *Id.* The doctrine of fraudulent concealment is applicable to that subset of equitable estoppel situations wherein the defendant engages in a wrongful effort to conceal its misconduct. *See Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1093–1095 (7th Cir. 1992); *see also Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000, 1004 (7th Cir.1984) (describing fraudulent concealment as involving "positive steps after commission of the fraud to keep it concealed."). Where the defendant actively conceals its misconduct, the statute of limitations does not run until the plaintiff actually discovers the misconduct whether or not the plaintiff was diligent in attempting to discover its injury. *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1461 (7th Cir.1992).[16]

■ Champion contends that the fraudulent concealment doctrine is inapplicable to plaintiffs' TILA claim because the TILA statute of limitations is jurisdictional and not subject to equitable extension. *See Cada v.*

*Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir.1990) ("neither [equitable estoppel nor equitable tolling] applies to a jurisdictional statute of limitations"), *cert. denied*, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991).

■ The Seventh Circuit has not addressed the issue of whether section 1640(e) creates a jurisdictional statute of limitations not subject to equitable estoppel. However, the Sixth and Ninth Circuits have both analyzed the issue and concluded that TILA's one-year limitation is subject to tolling. *See King v. California*, 784 F.2d 910, 914–915 (9th Cir.1986), *cert. denied*, 484 U.S. 802, 108 S.Ct. 47, 98 L.Ed.2d 11 (1987); *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1040–1043 (6th Cir.1984); *see also Bokros v. Associates Finance, Inc.*, 607 F.Supp. 869, 873 (N.D.Ill.1984) (holding that equitable tolling doctrines are read into TILA's statute of limitation). In reaching their holdings, the Sixth and Ninth circuits reasoned that TILA is a remedial statute and should be liberally construed in favor of the consumer. *King*, 784 F.2d at 915; *Jones*, 747 F.2d at 1040. Additionally, these courts concluded that TILA's congressional purposes would be best served by permitting the tolling of the statute of limitations in appropriate circumstances. *King*, 784 F.2d at 914–15; *Jones*, 747 F.2d at 1040–41. The Sixth Circuit ex-

**16.** Champion contends that the doctrine of "self-concealing frauds," *see Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir.1990), *cert. denied*, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991), not fraudulent concealment should apply in this case. There is much confusion in the Seventh Circuit regarding the application of these two doctrines. *See Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1093–95 & n. 17 (7th Cir.1992). The self-concealing fraud doctrine, has been said to apply in fraud cases where the defendant has engaged in " 'some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action.' " *Martin* at 1094, quoting *Hobson v. Wilson*, 737 F.2d 1, 34 (D.C.Cir.1984) (citing *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 25 L.Ed. 807 (1879)), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Fraudulent concealment, on the other hand, involves "active concealment that is separate from the underlying wrongdoing." *Martin*, 966 F.2d at 1094 n. 17. In its most recent pronouncement on the issue the

Seventh Circuit stated, "tolling applies to a statute of limitations where there is fraudulent concealment of either type," *id.*, however, in the case of self-concealing frauds, diligence is required. *Id.* We have applied the fraudulent concealment doctrine because the underlying misconduct involved procuring unauthorized insurance and billing plaintiffs for that insurance; thereafter, Champion engaged in active concealment of the wrongdoing. Our result would be no different if we applied the self-concealing fraud doctrine. We do not agree with Champion that had plaintiffs exercised ordinary diligence they would have sought out the master policy of insurance. Again, we find that nothing in the Certificates alerted plaintiffs to the possibility of Champion's misconduct. In the absence of any reason to believe that a wrongdoing has been committed, we cannot say that ordinary diligence required plaintiffs to seek out the master policy. Plaintiffs' obligation to exercise ordinary diligence was satisfied so long as they read the Certificates and assured themselves that everything appeared to be in order.

plicitly rejected the structural argument that section 1640(e) should be deemed jurisdictional because it both confers jurisdiction and specifies the time for filing suit in the same subsection. In rejecting this argument, the court noted that section 1640(e) simply has *two* functions: to confer jurisdiction and to define the statute of limitations. *Jones,* 747 F.2d at 1040. " '[T]he fact that the right and the limitation are written into the same statute does not indicate a legislative intent as to whether or when the statute of limitations should be tolled.' " *Id.,* quoting *Burnett v. New York Central R.R. Co.,* 380 U.S. 424, 427 n. 2, 85 S.Ct. 1050, 1054 n. 2, 13 L.Ed.2d 941 (1965). Finally, the Sixth Circuit noted, and the Ninth Circuit concurred, that:

> [o]nly if Congress clearly manifests its intent to limit the federal court's jurisdiction will it be precluded from addressing allegations of fraudulent concealment which by their very nature, if true, serve to make compliance with the limitation period imposed by Congress an impossibility.... We have been shown nothing in the language or history of TILA to indicate that 15 U.S.C. § 1640(e) should be interpreted otherwise, and, therefore, we hold that the statute is subject to equitable tolling.

*Jones,* 747 F.2d at 1041; *see King,* 784 F.2d at 915. This court agrees with the reasoning of the Sixth and Ninth Circuits—and in the absence of any Seventh Circuit authority to the contrary [17]—holds that TILA's statute of limitations is subject to the doctrines of equitable estoppel and tolling.

■ Plaintiffs contend that when Champion charged them for the Transamerica insurance, and included charges for insurance protecting Champion against the plaintiffs' default, Champion consummated a new consumer credit transaction. Plaintiffs further contend that the one-year TILA statute of limitations—which begins to run upon consummation of a new credit transaction—was tolled until the filing of their suits because Champion fraudulently concealed the existence of the additional coverage. Champion's fraudulent concealment was effected, Plaintiffs allege, by misrepresenting— through the Certificates of Insurance and other form documents—that the insurance procured covered loss and damage to the collateral when in fact it covered other matters. Citing *McCool v. Strata,* 972 F.2d 1452 (7th Cir.1992), Champion contends that plaintiffs cannot invoke the fraudulent concealment doctrine because the Certificates and other documents received by the plaintiffs were "at best truthful and at worst ambiguous." Defendant's Brief at 23.[18]

■ The plaintiffs in *McCool* sought to invoke the fraudulent concealment doctrine to preserve claims brought under the Securities and Exchange Act of 1934 and RICO. The plaintiffs were investors who claimed they were defrauded about the nature of their interests in an oil drilling project: the investors believed they owned certain mineral rights in property leases as tenants in common with the defendant when in fact they held only working interests in the oil wells. The investors alleged two acts of fraudulent concealment. The first involved periodic newsletters sent by the defendant to the investors reporting on the successes and problems with "our lease" and "our proper-

---

**17.** Defendant's citation to *Basham v. Finance America Corp.,* 583 F.2d 918 (7th Cir.1978), *cert. denied,* 439 U.S. 1128, 99 S.Ct. 1046, 59 L.Ed.2d 89 (1979), is inapposite. *Basham* states only that "[f]ailure to bring an action for damages within the one-year limitation period bars the action." *Id.,* 583 F.2d at 927. *Basham* string cites *Fenton v. Citizens Sav. Ass'n,* 400 F.Supp. 874 (C.D.Mo. 1975) as support for this proposition. Although *Fenton* held that TILA's statute of limitations is jurisdictional, 400 F.Supp. at 879, the issue of whether equitable tolling should apply was not before the court. Nor was this issue presented in *Basham.* Moreover, there is no indication in *Basham* that the Seventh Circuit agreed with *Fenton* 's holding that section 1640(e) is jurisdic-

tional. Accordingly, *Basham* is not controlling on this issue.

**18.** Actually, Champion made this argument in the context of arguing that equitable estoppel should not apply to plaintiffs' RICO claims. With respect to the TILA claim, Champion rested its time-limitation argument solely on the proposition that the TILA statute of limitations is jurisdictional. Having held that it is not, the court must now examine whether equitable estoppel may properly be applied to toll the statute of limitations and save plaintiffs' claims. In so doing, the court now resurrects Champion's argument.

ty." The second act of concealment involved so-called "division orders" which recorded the allocation of payments to each of the investors but which were redacted by the defendant prior to being mailed to the investors so that each investor received only the notations that related to his share of the proceeds. The investors first became suspicious when the defendant accidently sent out unredacted division orders which suggested to the investors that their interests in the wells were different from the defendant's interests. The Seventh Circuit held that the alleged acts of concealment did not sufficiently state a claim of active concealment. The court noted that "mere silence, even the silence of actors who have a duty to disclose, does not count." *McCool* at 1461. The court then reasoned:

> In this case the plaintiffs never requested information from Strata. Instead, their claims of fraud are based on the communications that Strata sent of its own accord. First, the investors argue that Strata actively concealed the fact that the interests were different from Strata's by redacting the division orders.... We have some difficulty attributing an evil motive to the deletion of the references to other investors.... Ordinary concerns for privacy would seem to mandate Strata's redactions. But even if the defendants' motives were bad, the division orders were accurate, and the plaintiffs have thus alleged no more than silence.

*Id.* at 1461–62. In rejecting the investors' claim that the newsletter references to "our lease" and "our property" were affirmatively misleading, the court stated:

Of course, the newsletters were not actually false. The Strata defendants could quite truthfully refer to the Lowe property as "ours"; after all, it was. But this defense of literal truth is perhaps to glib. More important, we think, is the observation of the trial court that the newsletters were, *at worst*, ambiguous.... [I]t is difficult to see how these informal newsletters would have been phrased differently..... If a communication would have been no different if issued by an honest defendant, it cannot be an act of concealment.

*Id.* at 1462. This court does not consider *McCool* to be a directive to all lower courts that all half-truths are hereby fair game in the area of fraudulent concealment. This case differs from *McCool* in several respects. First, Strata's redacting of the division orders is not equivalent to Champion's alleged role in excluding any reference to the additional coverage from the Certificates. In the former case, the division orders were intended to do no more than apprise the investors of their allocation of payments; and, in this regard they were accurate. In the instant case, the Complaint supports the reasonable inference that the Certificates were intended to apprise the plaintiffs of the nature of the insurance coverage procured by Champion and paid for by plaintiffs; and, in this regard the Certificates were not accurate. It may be true that the coverage described on the Certificate was included among the policy's coverage but that description was simply not an accurate statement of the coverage. As noted by the Seventh Circuit, the defense of literal truth is too glib.[19] *McCool*, 972 F.2d

19. By way of illustration of the proposition that telling a half-truth may be misleading (and perhaps a half-lie), the court notes that in arguing that TILA's statute of limitations is jurisdictional, Champion quoted the subtitle of § 1640(e) as "Jurisdiction of courts." It is literally true that the subtitle includes these words but this is nevertheless misleading. In fact, the subtitle includes more; accurately quoted, the subtitle reads: "Jurisdiction of courts; limitations on actions." The difference is significant in interpreting the statute as evidenced by the fact that courts have distinguished between jurisdictional and nonjurisdictional statutes of limitations guided precisely by whether the subsection heading reads "Jurisdiction" only, or, as in the case of TILA, reads "Jurisdiction of courts; limitations on actions." *See Chisolm v. Charlie Falk's Auto Wholesale, Inc.*, 851 F.Supp. 739 (E.D.Va.1994); *see also Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1039 (D.C.Cir.1986) (limitations action jurisdictional when occurring under subheading stating only "Jurisdiction of courts."). This example and footnote should serve as a reminder to Champion that this court expects no less than complete candor in representations made to the court.

at 1462. Moreover, in the instant case, an honest defendant could very easily have included the full scope of coverage on the Certificates or otherwise adequately alerted the borrowers to the fact that they were being charged for insurance coverage beyond loss or damage to the collateral. The court has already held that the Certificates did not put the plaintiffs on notice as to the existence of additional coverage and we need not revisit that issue again. Accordingly, the court finds that plaintiffs have adequately alleged facts to support a finding of fraudulent concealment; and, the court denies Champion's motion to dismiss Count II as time-barred.

### B. Failure to state a claim under TILA

 Champion argues that plaintiffs fail to state a cause of action under TILA because:

> in charging plaintiffs for collateral protection insurance, Defendant was merely exercising its right under the original Contracts to purchase policies for its own protection after Plaintiffs defaulted.... A charge to a consumer for an actual, unanticipated default is not a finance charge triggering new credit transaction disclosures.

Defendant's Brief at 34. Champion's argument is falsely alluring. Champion's characterization of the issue as involving charges for "collateral protection insurance" sidesteps the issue that plaintiffs do not challenge Champion for charging them for collateral protection insurance; rather, plaintiffs challenge Champion's practice of charging them for allegedly unauthorized coverage against the plaintiffs' potential default.

As discussed above, for purposes of this motion to dismiss, the court finds that the Sales Contracts are at best ambiguous with respect to what coverage Champion was authorized to purchase in the event that plaintiffs defaulted on their obligation to purchase and maintain automobile physical damage or loss insurance. A factfinder could find that the Sales Contracts did not authorize Champion to purchase and charge plaintiffs for insurance against plaintiffs' potential default. If a factfinder found such charges to be unauthorized, then it could also find that the charging of plaintiffs' accounts for the cost of that insurance did not constitute a charge for actual unanticipated default under section 226.4(c) of Federal Reserve Board Regulation Z. 12 C.F.R. § 226.4(c). Therefore, the charge to plaintiffs' accounts could be found to be a finance charge subject to TILA disclosure requirements. 12 C.F.R. § 226.4(d). Accordingly, the court finds that Plaintiffs have adequately pleaded a cause of action under TILA.

### IV. Champion's Motion to Dismiss the Supplemental State Claims

Because the court denies Champion's motion to dismiss plaintiffs' federal claims, Champion's motion to dismiss the supplemental state claims is without merit.

### CONCLUSION

Champion's Motion to Dismiss Plaintiffs' First Amended Complaint [21–1] is denied.

Plaintiffs are directed to file a written motion for class certification and supporting memorandum by September 1, 1994. Defendant should file its response by September 29, 1994.